**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Robert Towle


     v.                                          Civil No. 06-cv-464-JM


Commissioner, New Hampshire
Department of Corrections, et al.


### O R D E R

Plaintiff Robert Towle is an inmate at the New Hampshire
State Prison ("NHSP").  Towle seeks an injunction from this Court
directing the NHSP authorities to allow Towle visitation with his
wife.  A hearing on Towle's motion was held before me on March
22, 2007.  I directed the parties to file supplemental memoranda
which I have received and reviewed.  Upon consideration of the
evidence adduced at the hearing, and the arguments before the
Court, I deny the motion for a preliminary injunction for the
reasons stated herein.

### Standard of Review

Preliminary injunctive relief is available to protect the
moving party from irreparable harm, so that he may obtain a
meaningful resolution of the dispute after full adjudication of
the matter.  Such a situation arises when some harm from the

challenged conduct could not be adequately redressed with traditional legal or equitable remedies following a trial.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996) (finding irreparable harm where legal remedies are inadequate); see also Acierno v. New Castle County, 40 F.3d 645, 653 (3rd Cir. 1994) (explaining irreparable harm and its effect on the contours of preliminary injunctive relief). Absent irreparable harm, there is no need for a preliminary injunction.

The need to prevent irreparable harm, however, exists only to enable the court to render a meaningful disposition on the underlying dispute.  See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 620-21 (1st Cir. 1995) (explaining the purpose of enjoining certain conduct as being to "preserve the 'status quo' . . . to permit the court more effectively to remedy discerned wrongs"); see also Becton v. Thomas, 48 F. Supp. 2d 747, 753 (W.D. Tenn. 1999) ("'The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" (quoting Stenberg v. Cheker Oil Co., 573 F.2d 921, 925 (6th Cir. 1978)).  The court's focus, therefore, must always

be on the underlying merits of the case, and what needs to be
done to ensure that the dispute can be meaningfully resolved.

A preliminary injunction cannot issue unless the moving
party satisfies four factors which establish its need for such
relief.  See Esso Standard Oil Co. v. Monroig-Zavas, 445 F.3d 13,
17-18 (1st Cir. 2006) (discussing the requisite showing to obtain
a preliminary injunction); see also Ross-Simons, 102 F.3d at 18-
19 (explaining the burden of proof for a preliminary injunction).
Those factors are:  "(1) the likelihood of success on the merits;
(2) the potential for irreparable harm [to the movant] if the
injunction is denied; (3) the balance of relevant impositions,
i.e., the hardship to the nonmovant if enjoined as contrasted
with the hardship to the movant if no injunction issues; and (4)
the effect (if any) of the court's ruling on the public
interest."  Esso Standard Oil, 445 F.3d at 18.  If the plaintiff
is not able to show a likelihood of success on the merits, the
remaining factors "become matters of idle curiosity," id.,
insufficient to carry the weight of this extraordinary relief on
their own.  See id. (the "sine qua non of the four-part inquiry
is likelihood of success on the merits").  Yet, "the predicted

3

harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." Ross-Simons, 102 F.3d at 19.

Since Towle must demonstrate his likelihood of success on the merits, the preliminary issue of whether he has stated a claim upon which relief may be granted arises. Under this Court's local rules, when an incarcerated plaintiff commences an action, the magistrate judge is directed to conduct a preliminary review and to prepare a report and recommendation determining whether the complaint or any portion thereof should be dismissed because:

> (i) the allegation of poverty is untrue, the action is frivolous, malicious, or fails to State a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief under 28 U.S.C. § 1915A(b); or
>
> (ii) it fails to establish subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

LR 4.3(d)(2). In conducting the preliminary review, the Court construes pro se pleadings liberally. See Ayala Serrano v. Lebron Gonzales, 909 F.2d 8, 15 (1st Cir. 1990) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976) to construe pro se pleadings liberally in favor of the pro se party). "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the

4

correct cause of action, even if it was imperfectly pled." Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997), cert. denied, Ahmed v. Greenwood, 522 U.S. 1148 (1998).  Additionally, all plaintiff's factual assertions and inferences reasonably drawn therefrom must be accepted as true.  See Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996) (stating the "failure to state a claim" standard of review and explaining that all "well-pleaded factual averments," not bald assertions, must be accepted as true).  This ensures that pro se pleadings are given fair and meaningful consideration.  See Eveland v. Dir. of C.I.A., 843 F.2d 46, 49 (1st Cir. 1988).

<u>Background</u>

I.   <u>Procedural Posture of the Matter Before the Court</u>

The complaint here was preliminarily reviewed on February 5, 2007.  I issued an Order directing that the First Amendment right of association claim raised in Towle's complaint be served on defendants Wrenn, Cattell and Crompton.  In a Report and Recommendation issued simultaneously with the February 5 Order, I recommended that all of the other claims and defendants in Towle's complaint be dismissed.[1]

---

[1]In addition to the First Amendment claim, Towle's initial complaint challenged the denial of visitation with his wife under

II.  <u>Facts Regarding the Denial of Visitation</u>

Towle is in custody serving a sentence for operating a motor vehicle after being certified as a habitual offender.[2]  Towle is married to Katie Wilmot, with whom he is raising two young boys, one of whom is his son, and one of whom is the son of another prison inmate.  Towle claims that he contacted the NHSP Warden, pursuant to NHSP policy, to request that his wife be allowed to visit him with the boys during his incarceration.  Towle was permitted to visit with his own son, as long as his son was

---

the Eighth Amendment's prohibition against cruel and unusual punishment as well as under the First Amendment.  I recommended dismissal of the Eighth Amendment claim as the Supreme Court, in <u>Overton v. Bazzetta</u>, 539 U.S. 126, 137 (2003) held that temporary denial of visitation rights was not actionable under the Eighth Amendment.  Towle also alleged a due process claim based on the fact that someone other than the Commissioner of the New Hampshire Department of Corrections responded to his appeal of the visitation decision.  Finding no due process right in having the Commissioner personally answer the correspondence in question, I recommended dismissal of that claim.  My recommendation became an order of dismissal of the Eighth Amendment and Due Process claims when Judge Barbadoro was recused from the case and the matter was reassigned to my docket on March 8, 2007.

[2]According to the New Hampshire Department of Corrections website, Towle is serving a 1-2 year sentence for the habitual offender offense, and will be eligible for parole in June of 2007.  Towle stated at the hearing that he was facing a consecutive sentence on child pornography charges, but it is not clear whether Towle has been convicted of those charges, and, if so, what sentence he will serve.

accompanied by a responsible adult.  The Warden denied Towle
visitation with his stepson, because his stepson appeared on
another inmate's visiting list.  On August 28, 2006, the Warden
denied Towle's requests to visit with his wife, indicating that
the basis of her exclusion was Wilmot's "recent criminal history,
specifically, her "felony conviction that [was] only three years
old."  Wilmot was convicted of felony theft from her former
employer, Wal-Mart, in January of 2007 and sentenced to two years
of probation.  The theft conviction is her only criminal record.[3]

On September 3, 2006, Towle appealed the denial of
visitation with Wilmot to the Commissioner of the New Hampshire
Department of Corrections.  On behalf of the Commissioner, Deputy
Commissioner Greg Crompton responded to Towle, stating "[t]he
conviction date does not meet the 5 yr. requirement.  Request is
denied."

On November 4, Towle again asked the Warden to grant him
visits with his wife, claiming that the NHSP's Policy and

---

[3]Towle also alleged that prison officials initially denied
Wilmot visitation because they did not believe that Wilmot and
Towle were legally married.  This misunderstanding seems to have
been resolved as the prison officials have accepted that Wilmot
is Towle's legal wife.

Procedure Directive ("PPD") 7.09(I)(4) did not contain any provision that specifically provided for the disallowal of his wife.  His appeal was denied.  In the denial of the appeal, the Warden noted that while PPD 7.09(I)(4) positively excluded two categories of convicted persons from visitation, it did not positively indicate that people convicted of other felonies or who received non-incarcerative sentences would be approved. Towle again requested that the denial be reconsidered, to no avail.

If an inmate is denied visits with a particular visitor through ordinary channels, an inmate must request a special visit.  Towle alleges that he made a number of special visit requests, and all but one of them were denied.  During that specially granted visit, which occurred in the fall of 2006, Towle was able to spend two to two and a half hours with his wife and son.  On one other occasion, Towle was able to see his son and his brother-in-law at a prison Christmas party.  Prior to the March hearing in this matter, Towle had not seen his wife on any other occasion since his June 2006 incarceration, except the one specially allowed visit.

Both Towle and Wilmot testified at the hearing that they communicate by letter and by collect phone call.  Wilmot stated that she can afford approximately six thirty minute phone calls per month, but that they are expensive and inconvenient, as she has to prepay the phone company $25 every two weeks so that she can receive three collect calls lasting approximately 30-40 minutes apiece.  Wilmot states that she is unemployed and exists on government assistance, and that the $465 she has spent on phone calls since Towle's incarceration has been a significant financial hardship for her.  Towle and Wilmot both stated that phone contact was insufficient to meet their emotional needs, and their need to nurture their marriage during the hardship of Towle's incarceration and Wilmot's resulting isolation. Additionally, Towle and Wilmot describe the phone calls as difficult because of background noise, frequent interruptions and disconnections, and lack of privacy, as phone calls are monitored at the prison.

Towle and Wilmot write to one another, but they find that letters are insufficient to express everything that a marriage needs to be sustained.  Also, Towle stated that while he tries to

write to his wife three times a week, he has, of late, been
unable to afford the postage to continue that pace.

Wilmot testified that she independently wrote to the NHSP
Warden seeking permission to visit her husband.  The Warden
denied her request due to her criminal history.

Finally, NHSP Major Daniel Shaw testified at the March 22
hearing on Towle's motion.  Shaw is the chief of security at the
NHSP.  Shaw testified that in this capacity, one of his
responsibilities is reviewing inmate requests for visitors.  Shaw
testified that in reviewing these requests, he utilizes PPD 7.09
to govern his decisions.[4]  Shaw also testified that while PPD

---

[4]PPD 7.09 states, in parts relevant to this Order, as
follows:

> I. Purpose: To establish a policy and procedure
> for secure, safe, orderly, manageable and pleasant
> inmate and business visitations and to implement
> COR 305.02 and COR 306.04 of the NH Code of
> Administrative Rules, (Attachment 1).  Secondly,
> to foster relationships with family and community
> volunteers that will improve the opportunities for
> inmates to successfully reintegrate into the
> community.
>
> . . .
>
> III. Policy: Visiting is a privilege.  It is the
> policy of the Department of Corrections to provide
> time and facilities for inmate visitations in
> order to support and maintain relationships
> between inmates and significant people in their

_____

lives, and to be no more restrictive toward
visitors than necessary for the security of the
visitation, the welfare of the inmates and staff
and to exclude contraband.

. . .

IV. B. Procedure/Authorized Visitors: DOC Staff
must approve all visitors.  Inmates will be
authorized an unlimited number of family members
on their visiting list.  Non-family members will
be limited in accordance with COR 305.02.  All
potential visitors will undergo a criminal history
check.

. . .

IV. I. 4. Visiting Lists: Potential visitors with
criminal records or who are on probation/parole
will not be granted visiting privileges.  A direct
family member (father, mother, sister, brother,
child, spouse, aunts, uncles, grandparents,
sister-in-law or brother-in-law) of an inmate who
is also on probation/parole may be authorized to
visit only with the written approval of the Warden
and the supervising PPO.  Potential visitors with
drug convictions within the last fives years and/
or confinement for any offense within the last
five years will be excluded.  Exception to this
policy may be made by written appeal to the
Warden.  Any articulable risk to security will
exclude a visitor.

Furthermore, State administrative regulations also provide for
the exclusion or restriction of visitors to the prison when a
visit by that person would jeopardize security or safety.  N.H.
Admin Code Cor 305.02(d)(1).  Further, the State regulations
mandate that "[p]ersons convicted or under present indictment for
a misdemeanor or felony in any jurisdiction shall not visit any
resident without first obtaining written permission from the
commissioner of corrections, or his designee . . .."  N.H. Admin

7.09 offers guidelines and some criteria for denying visitation,
he understands his role to include a substantial exercise of
discretion in evaluating requests for visitation.  He also
testified to the extent of his discretion in evaluating the
security and other interests of the prison in determining whether
or not a particular individual should be permitted to visit.

Shaw stated that he was not in his current position at the
time that Towle was initially denied visitation with Wilmot and
did not have personal knowledge of how that particular request
was handled.  Shaw stated, however, that in general, once an
inmate makes a request for a particular visitor, a criminal check
on that visitor is completed.  If a criminal record is located
for a particular individual, that record is forwarded to a
Lieutenant to review for a determination of whether or not the
visitor will be permitted.  If the Lieutenant denies the visitor,
an appeal can be made to the Major.  Shaw testified that when he
reviews these appeals, he considers a variety of factors in
making the decision whether or not to overturn the Lieutenant's
denial.  Some of these factors are: the nature of the prior

Code Cor. 305.02(p).

12

offense, specifically, whether or not the prior offense involved
violence, deception or illegal drugs, the age of the prior
offense, whether or not the convicted person had been compliant
with the terms of his or her sentence, including whether or not
he or she had violated parole or probation, whether or not the
conviction was for a felony or misdemeanor, involved weapons or
children, whether or not the potential visitor had ever been
involved in an attempted escape, or whether there were any other
circumstances indicating that the potential visitor would create
a security concern relating to violence or contraband.

Although Shaw says that certain guidelines in PPD 7.09
indicate that a five year exclusion is applied to visitations for
certain convicted persons, Shaw claims he does not apply that
rule.  Shaw instead relies on an evaluation of all of the factors
he feels are relevant to the security of the institution in
making a particular decision.  Shaw stated that although he did
not make the decision to deny visits by Wilmot in this case, if
he had, he would likely have denied her visitation based on the
recency of her conviction, the fact that Wilmot was convicted of
a felony that involved deception, and the fact that the offense

involved cooperation with a number of other people to commit the offense.

Shaw opined that if the prison were forced to admit visitors who would be potentially detrimental to prison security without having the discretion to exclude certain people, there would be chaos at the prison.  The visiting room, Shaw claims, would be a dangerous place where violence and the passing of contraband would occur, placing both inmates and visitors at risk.

Here, reviewing the language of PPD 7.09, Shaw testified that he would not have excluded Wilmot based on a "five year rule," to the extent such a rule exists, but that he would exclude Wilmot based on her criminal record, exercising the discretion he believes is accorded to the prison administration under the prison rules.  Shaw conceded that if the prison administration relied on the "five year rule" in PPD 7.09, than the basis for the exclusion was incorrect.

III. PPD 7.09

The parties dispute the proper interpretation of PPD 7.09(I)(4), which states:

> Potential visitors with criminal records or who
> are on probation/parole will not be granted
> visiting privileges.  A direct family member
> (father, mother, sister, brother, child, spouse,

aunts, uncles, grandparents, sister-in-law or
brother-in-law) of an inmate who is also on
probation/parole may be authorized to visit only
with the written approval of the Warden and the
supervising PPO.  Potential visitors with drug
convictions within the last fives years and/or
confinement for any offense within the last five
years will be excluded.  Exception to this policy
may be made by written appeal to the Warden.  Any
articulable risk to security will exclude a
visitor.

The plaintiff argues that the rule should be read to mean
that while potential non-family visitors with criminal records
will be excluded, that direct family members are excepted from
this rule.  The plaintiff urges that under his reading of the
rule, direct family members would not be excluded on the basis of
a criminal record unless they are on probation or parole and
don't have the permission of their probation or parole officer,
and if they have not had a drug conviction or any incarceration
in the last five years.

Defendants, on the other hand, argue that the rule, while
poorly worded, states a general policy that all potential
visitors, including families, will be excluded if they have a
criminal record.  The defendants further argue that the rule
states that no exceptions to the criminal record exclusion will
be granted for those potential visitors who have been convicted

of a drug offense or who have been incarcerated during the last
five years.  Otherwise, an exception to the criminal record
exclusion may be had by appeal to the Warden.  In any event, the
prison states that the provision in that paragraph that "[a]ny
articulable risk to security will exclude a visitor," as well as
the provision granting inmates leave to seek an exception to the
rule by written appeal to the Warden, leaves the ultimate
decision to allow or disallow a potential visitor to the
discretion of the prison administration.

I agree wholeheartedly with the testimony describing this
rule as poorly worded and difficult to understand.  Read
according to the defendants' interpretation, the regulation
contains a wholly redundant exclusion of people convicted of drug
offenses or incarcerated in the last five years.  The defendants
argue that this exclusion is merely identifying a subset of
"potential visitors with criminal records" that will not be
granted exceptions.  I find that the rule does not actually make
that interpretation clear.  On the other hand, the rule cannot be
clearly construed, as plaintiff claims, to mean that the
provisions concerning drug convictions or incarceration within
the last five years necessarily limits exclusion of family

members to those who fall within the two "five year" categories
of convicted persons.  This reading would essentially exempt
direct family members from the visitation requirement that they
not be convicted criminals, unless their convictions were for
drugs or resulted in incarceration during the last five years.
Applying this logic a bit further, it appears that, read as the
plaintiff urges, the prison would not be allowed to exclude a
prisoner's family member, under this section of PPD 7.09, for a
sexual assault, a violent assault, a weapon charge, arson, or any
other serious felony, if that felony was not drug-related and did
not result in the serving of a prison sentence.  While plaintiff
might argue that other sections of PPD 7.09 permit the exclusion
of such persons as generalized risks to institutional security,
such an argument also necessarily concedes that those other
sections of PPD 7.09 would permit the exclusion of Wilmot in this
instance.

PPD 7.09 is, at best, ambiguous on its face and, if it were
to be relied on as a basis to deny visitation with an inmate's
family member, it might present a due process problem.[5]  The

_____

[5]I note that the only person who specifically relied on the
"five year rule" to justify excluding Wilmot from the prison was
Greg Crompton, Deputy Commissioner of the Department of
Corrections, and the individual who responded to Towle's appeal

defendants proffered evidence at the hearing that this rule has
been identified by the newly installed NHSP Warden, Richard
Gerry, as one that is in need of rewriting and clarification, and
that the process to revamp this provision of the PPD, therefore,
is underway or will be underway in the near future.  Because I
will deny the motion for injunctive relief without reaching the
merits of this particular rule, however, I find that for purposes
of this Order, and particularly in light of its numbered days, I
need not delve further into the correct interpretation of the
rule at this time.

Discussion

In order to obtain the injunctive relief he seeks, Towle
must establish that he is likely to succeed on the merits of his
First Amendment claim.  Towle has alleged in this suit that his

---

on behalf of the Commissioner.  It appears that in making an
effort to rubber-stamp the Warden's denial of Wilmot as a
visitor, Crompton misread either the Warden's denial, the rule,
or both, and incorrectly applied a rule to Wilmot that, under any
reading of the rule, simply does not apply.  Whether the rule is
read to include a "five year" consideration for just family
members or for all potential visitors, it is clear that the five
year consideration, in either case, applies only to drug cases or
cases resulting in incarceration, neither of which apply to
Wilmot.  My decision in this matter, however, is not ultimately
affected by Crompton's misapplication of the rules, and I will
not, therefore, address possible remedies for Crompton's error.

18

right of intimate association has been violated by the NHSP's
denial of visitation with his wife.

I.   <u>First Amendment Claim</u>

While a prisoner loses many of his constitutional rights
upon incarceration, he "retains those First Amendment rights that
are not inconsistent with his status as a prisoner or with the
legitimate penological objectives of the corrections system."
<u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974).  However, the First
Amendment right to free association is "among the rights least
compatible with incarceration" and "[s]ome curtailment of that
freedom must be expected in the prison context."  <u>Overton v.
Bazzetta</u>, 539 U.S. 126, 131 (2003).  However, the right to
intimate association is not necessarily entirely eliminated by
incarceration.  <u>Id.</u> at 131-32.  If prison officials seek to limit
the First Amendment right of association, it may do so if the
limiting regulations bear a rational relationship to legitimate
penological objectives.  <u>Id.</u> at 132 (<u>citing Turner v. Safley</u>, 482
U.S. 78, 89 (1987)).  This Court must accord prison
administrators significant deference in defining legitimate goals
for the corrections system, and for determining the best means of

accomplishing those goals.  See Overton, 539 U.S. at 132; Pell, 417 U.S. at 826-27.

A court, in evaluating whether or not a particular prison regulation is constitutional, considers four factors: (1) whether the regulation has a "valid, rational connection" to a legitimate penological objective, (2) "whether any alternative means are open to inmates to exercise the asserted right," (3) "what impact an accommodation of the right would have on guards and inmates and prison resources," and (4) "whether there are ready alternatives to the regulation."  Overton, 539 U.S. at 132 (citing Turner, 482 U.S. at 89-91).

Applying the evidence introduced at the hearing on this matter to the four Turner factors set out above, I find as follows.  First, the visitation restriction set forth in PPD 7.09, as described by Major Shaw, prohibits visits by people with criminal records.  While the rule is not absolute, as it allows for the exercise of discretion in granting exceptions or requests for special visits, the existence of the regulation advances the legitimate penological goals of allowing prison officials to determine whether or not the criminal history of a particular person would create a likelihood of a security risk or a

disruption to order at the prison.  The ability to exclude
potential visitors with criminal records also serves the
additional legitimate purposes of maintaining a safe visiting
room and controlling the flow of contraband into the prison.  PPD
7.09, by its own terms, states that the rules restricting
visitors are intended to insure "the security of the visitation,
the welfare of the inmates and staff and to exclude contraband."
There is no question that all of these objectives are legitimate
penological interests, and that the regulation bears a rational
relationship to those objectives.

Second, the record demonstrates that Towle does have
alternative means to exercise his right to associate with his
wife.  Towle is able to write to his wife when he has postage, as
much as he likes.  Further, Towle is able to receive letters from
Wilmot.  Towle and Wilmot also testified that they are able to
talk by telephone six times a month for approximately thirty
minutes at a time.  While these modes of contact may not meet all
of Towle's hopes for communication with his wife during his
incarceration, "[a]lternatives to visitation need not be ideal,
however; they need only be available."  <u>Overton</u>, 539 U.S. at 135
(finding brief and expensive phone calls are sufficient

substitutes to protect an inmate's First Amendment right to visitation).

Regarding the third <u>Turner</u> factor, accommodating inmates' right to associate with family members by removing discretionary exclusion of family members with criminal records would cause "chaos" unless changes were also made to the allocation of prison resources.  Shaw testified that denying the prison the ability to exclude potential visitors who are potential security risks, as many potential visitors with criminal histories are, would significantly increase violence and contraband in the visiting room, thereby making a significant impact on the guards, inmates, and other resources of the prison.

Finally, the plaintiff alleges that there are ready alternatives to the prohibition against relatives with criminal behaviors.  Exceptions can be, and have been, made to this rule, and such an exception could be granted in Towle's case.  While defendants concede that exceptions can be made, they assert that an injunction requiring the prison to allow Wilmot to visit, after she was properly excluded by legitimate regulations, would set an undesirable precedent encouraging inmates to file lawsuits every time they were dissatisfied with an administrative

22

decision.  Aside from simply making an exception to the rule,
which the prison has legitimate reasons for not wanting to do,
plaintiff did not offer evidence of any alternative means of
accommodating his asserted right to visitation with his wife that
would not impose more than a de minimus strain on the NHSP's
valid penological interests.

Accordingly, I find that the regulation restricting
visitation, while it impinges in some instances on Towle's
ability to exercise his right to association, does not do so in
an unconstitutional manner.  Therefore, I find that Towle cannot
demonstrate that his First Amendment right has been
unconstitutionally abridged.  Towle is therefore not likely to
succeed on the merits of his First Amendment claim.

II.  <u>Fourteenth Amendment Claim</u>

While it was not explicitly raised in the complaint and,
consequently, not explicitly discussed in my February 5 Order, I
find that Towle's assertions amount to a claim that he is
entitled to the protections of the Due Process Clause of the
Fourteenth Amendment because, while he may not have a First
Amendment right to visits with his wife, he alleges that the
regulations written by the State have created such a liberty

interest, and that he cannot be deprived of that liberty without due process of law.

The Fourteenth Amendment forbids the State from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To State a Fourteenth Amendment claim, therefore, a plaintiff must first allege either that the Due Process Clause itself gives rise to the liberty interest asserted, or that such an interest has been created by the State, and second, that he has been denied adequate procedures prior to being deprived of the right. Ky. Dep't of Corrs. v. Thompson, 490 U.S. 454, 460 (1989) (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972) and Hewitt v. Helms, 459 U.S. 460, 472 (1983)).

The Supreme Court has found that a prisoner does not have a right, arising out of the Due Process Clause, to "unfettered visitation." Thompson, 490 U.S. at 460. Further, "[t]he denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence,' and therefore is not independently protected by the due process clause." Thompson, 490 U.S. at 461 (quoting Hewitt, 459 U.S. at 468) (internal citations omitted). Therefore, to

State a Fourteenth Amendment claim, plaintiff must allege that he possesses a State-created liberty interest.  See Thompson, 490 U.S. at 460.

To determine whether or not the State has created a liberty interest, courts used to evaluate the language of the regulation in question to determine whether it created a mandate to administrators or allowed for administrative discretion in its application.  See Sandin v. Conner, 515 U.S. 472, 481-82 (1995).  However, in Sandin, the Supreme Court rejected the approach of parsing the language of a particular regulation to look for mandatory clauses, and adopted an approach that examines the nature of the liberty interest allegedly abridged.  Id. at 482.  Accordingly, a liberty interest

> will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Id. at 484.

This Court has previously held that an opportunity granted to prisoners as a privilege, rather than as a right, is not a liberty interest created by the State.  Reid v. Stanley, Civ. No.

25

04-cv-369-JD, 2006 WL 1875335, *4 (D.N.H. July 6, 2006) (finding

that because New Hampshire provides prisoners with the

opportunity for parole as a privilege and not as a right, that

the State has not created a liberty interest in the opportunity

for parole).  Here, PPD 7.09 states several times that the

granting of visitation to inmates is a privilege, not a right.

See PPD 7.09 (III) ("Visiting is a privilege."); PPD

7.09(IV)(N)(1) ("Visitation is a privilege and not a right...").

Accordingly, I find that the State has not created a liberty

interest in visitation simply by creating opportunities for

inmates to receive visits.[6]  Therefore, the denial of visitation

does not deprive Towle of any right protected by the

---

[6]Even if I were to find that a liberty interest in some
visitation had been created by virtue of the ambiguity in the
wording of PPD 7.09, I would find that the denial of visitation
here, made pursuant to that regulation, does not impose any
hardship that is "atypical of the normal incidents of prison
life" and therefore does not constitute a due process violation.
See Sandin, 515 U.S. at 484.  Prisoners can expect that their
contact with convicted felons, even those felons to whom they are
married, may be restricted during their incarceration.  In this
case, the prison has not denied visitations between Towle and
Wilmot forever, but has found that her felony conviction
indicating deceptive behavior is too recent to make her a good
security risk at this time.  This restriction is exactly the sort
of restriction an inmate must expect upon incarceration.  See
Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003) (collecting
cases finding loss of visitation privileges to be ordinary
incidents of prison confinement).

Constitution, and I find, therefore, that he is unlikely to succeed on the merits of his Fourteenth Amendment claim.

<u>Conclusion</u>

I find that Towle is unlikely to succeed on the merits of either a First or Fourteenth Amendment claim for relief.  As a preliminary injunction may not issue absent a finding of likelihood of success on the merits of the claims, I need not address the other preliminary injunction factors.  <u>See</u> <u>Esso</u> <u>Standard Oil</u>, 445 F.3d at 18.  Plaintiff's motion for injunctive relief (document no. 6) is denied.

**SO ORDERED.**

                         <u>/s/ James R. Muirhead</u>
                         James R. Muirhead
                         United States Magistrate Judge

Date:    April 16, 2007

cc:      Barbara R. Keshen, Esq.
         Michael J. Sheehan, Esq.
         Andrew B. Livernois, Esq.